Todd D. Carpenter (CA Bar No. 234464)
tcarpenter@carlsonlynch.com
**CARLSON LYNCH, LLP**
1350 Columbia St., Ste. 603
San Diego, CA 92101
Tel:  (619) 762-1900
Fax:  (619) 756-6991

Jeffrey D. Kaliel (CA Bar No. 238293)
jkaliel@kalielpllc.com
Sophia Gold (CA Bar No. 307971)
sgold@kalielpllc.com
**KALIEL PLLC**
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C., 20009
Tel:  (202) 350-4783

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HELEN LOTSOFF and ASHLEIGH HARTMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A., FCTI, INC. and DOES 1-50, inclusive,<br><br>Defendants. | Case No.:   3:18-cv-2033-AJB-MDD<br><br>**OPPOSITION TO DEFENDANT WELL FARGO BANK, N.A.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Date:       March 5, 2020<br>Time:       2:00 p.m.<br>Courtroom:  4A, Suite 4135<br><br>Honorable Anthony J. Battaglia<br><br>Complaint:  May 29, 2018<br>Removed:    August 30, 2018 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

FACTUAL BACKGROUND...............................................................................1

LEGAL STANDARD...........................................................................................2

ARGUMENT .......................................................................................................2

I.   Wells Fargo Breached its Contract...........................................................2

    A.   The Assessment of OD Fees on APPSN Transactions Is a Breach of the Account Agreement ........................................................................2

        1.   Wells Fargo's Account Agreement Promises to Determine Overdrafts at Authorization .................................................3

        2.   Wells Fargo's Arguments Are Not Compelling ...................8

    B.   Wells Fargo Breaches its Contract When It Charges Two Fees on the Same Item...............................................................................10

        1.   Wells Fargo Promises to Charge a Single NSF Fee Or OD Fee on an Insufficient Funds Item ......................................11

            a.   ACH Payment Background ................................11

            b.   Wells Fargo Breaches its Contract .....................12

        2.   Plaintiff's Interpretation of the Contract is More Reasonable Than Defendant's..................................................................15

            a.   Banks and Credit Unions Use the Term "Item" in the Plain, Commonsense Way Plaintiff Urge...........................15

            b.   Payment Association Rules Support Plaintiff's Interpretation of the Account Documents. ...........................16

        3.   Wells Fargo Breached the Covenant of Good Faith and Fair Dealing When it Assessed Multiple Fees on the Same Item.........17

    C.   Wells Fargo Breaches Its Contract When It Charges Numerous Balance Inquiries on a Single Balance Inquiry.....................................................18

        1.   Express Breach...................................................................18

         2.   Wells Fargo Breached the Covenant of Good Faith and Fair Dealing In Assessing Two Balance Inquiry Fees...........................19

II.   The Motion to Dismiss The Causes of Action Under § 17200 Should Be Denied................................................................................................20

1

### TABLE OF CONTENTS (cont.)

2

**Page**

3  A. Lotsoff And The Multiple Fee Class State A Claim Under The UCL .....20

4  B. Hartman And The OON Class State A Claim Under The UCL ...............21

5  C. Hartman And The APPSN Class State A Claim Under The UCL ...........22

6 III. Hartman And The FCTI ATM Class State A Claim For Conversion.................23

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANT WELL FARGO BANK, N.A.'S MOTION TO DISMISS
Case No.:  3:18-cv-2033-AJB-MDD

# <u>TABLE OF AUTHORITIES</u>

<div align="right"><u>Page(s)</u></div>

**Cases**

*ASARCO, LLC v. Union Pac. R. Co.,*
   765 F.3d 999 (9th Cir. 2014)................................................................15

*Best Buy Stores, L.P. v. Manteca Lifestyle Center, LLC,*
   859 F. Supp. 2d 1138 (E.D. Cal. 2012)................................................19

*Bodnar v. Bank of Am., N.A.,*
   No. 14:cv-03224 (E.D. Pa. Oct. 15, 2014)............................................8

*Boone v. MB Financial,*
   No. 18-CV-1771, 2019 WL 1584553 (N.D. Ill. Apr. 12, 2019)................8

*Clark v. Hills Bank and Trust,*
   No. LACV080753 (Johnson County, Iowa) ...........................................8

*Dillon v. BMO Harris Bank, N.A.,*
   856 F.3d 328 (4th Cir. 2017)................................................................13

*Figueroa v. Capital One, N.A.,*
   No. 18CV692 JM(BGS), 2019 WL 4962971 (S.D. Cal. Oct. 7, 2019)................3, 21

*Garcia v. UMB Bank NA,*
   No. 1916-CV01874 (Jackson Co. Mo. Circuit Court Oct. 18, 2019)...................3, 16

*Gunter v. United Fed. Credit Union,*
   No. 3:15-cv-00483-MMD-WGC, 2016 WL 3457009 (D. Nev. June 22, 2016)........9

*Haskell v. UMB Bank, N.A.*
   (Jefferson County, Missouri) ...............................................................8

*Hawthorne v. Umpqua Bank,*
   No. C-11-6700 YGR, 2012 WL 1458194 (N.D. Cal. Apr. 26, 2012) .....................24

*Herron v. Best Buy Co., Inc.,*
   924 F.Supp.2d 1161 (E.D. Cal. 2013)...................................................22

*In re Checking Account Overdraft Litig.,*
   694 F. Supp. 2d 1302 (S.D. Fla. 2010) ...........................................25, 26

*In re TD Bank, N.A.,*
   150 F. Supp. 3d 593 (D.S.C. 2015)..................................................9, 26

*In re Tobacco II Cases,*
   46 Cal. 4th 298 (2009) .........................................................................25

*Ingram v. Teachers Credit Union,*
   No. 49D01-1908—PL-O35431 (Marion Sup. Ct. Feb. 18, 2020).....................3, 16

1

# **TABLE OF AUTHORITIES (cont.)**

2

**Page(s)**

3

**Cases (cont.)**

4

*Kelly v. Community Bank, N.A.*,
   No. 8:19-cv-00919-MAD-CFH (N.D.N.Y. Feb. 18, 2020) ........................................7

5

*Lambert v. Navy Federal Credit Union*,
   2019 WL 3843064 (E.D. Va. Aug. 14, 2019)...........................................................16

6

7

*Lloyd v. Navy Fed. Credit Union*,
   No. 17-CV-1280-BAS-RBB, 2019 WL 2269958 (S.D. Cal. May 28, 2019).............3

8

*Lloyd v. Navy Federal Credit Union,* No. 17-cv-1280-BAS-RBB,
   2018 WL 1757609 (S.D. Cal. Apr. 12, 2018)......................................................passim

9

*Marsu, B.V. v. Walt Disney Co.*,
   185 F.3d 932 (9th Cir. 1999)...................................................................................19

10

11

*Morris v. Bank of America, N.A.*,
   No. 18-cv-157-RJC-DSC, 2019 WL 1274928 (W.D.N.C. Jan. 8, 2019),
   *report and recommendation adopted in part,*
   2019 WL 1421166 (W.D.N.C. Mar. 29, 2019)....................................................3, 16

12

13

*Murphy v. DirecTV, Inc.*,
   724 F.3d 1218 (9th Cir. 2013)...............................................................................11

14

15

*Pinkston-Poling v. Advia Credit Union*,
   227 F. Supp. 3d 848 (W.D. Mich. 2016) ................................................................9

16

*Ramirez v. Baxter Credit Union*,
   No. 16-cv-03765-SI, 2017 WL1064991 (N.D. Cal. Mar. 21, 2017) ......................9

17

18

*Roberts v. Capital One, N.A.*,
   719 F. App'x 33 (2d Cir. 2017) .............................................................................8

19

*Ronpak, Inc. v. Elecs. for Imaging, Inc.*, No. 14-CV-04058-JST,
   2015 WL 179560 (N.D. Cal. Jan. 14, 2015) ........................................................21

20

21

*Tannehill v. Simmons Bank*,
   No. 3:19-cv-140-DPM, 2019 WL 7176777 (E.D. Ark. Oct. 21, 2019)...........3, 16, 18

22

*Tisdale v. Wilson Bank and Trust*,
   No. 19-400-BC (Tenn. Bus. Ct., Oct. 17, 2019) ...............................................3, 16

23

24

*Welco Electronics, Inc. v. Mora*,
   223 Cal. App. 4th 202 (2014) ...............................................................................25

25

*Wells Fargo Bank, N.A. v. Jackson Jenkins Renstrom LLP*,
   2015 WL 1138419 (Ct. App. Cal. Mar. 12, 2015).................................................25

26

27

*White v. Wachovia Bank, N.A.*,
   563 F.Supp.2d 1358 (N.D. Ga. 2008) ...................................................................26

28

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

**Cases (cont.)**

*Williams v. Gerber Prods. Co.*,
  552 F.3d 934 (9th Cir. 2008)...................................................................23

*Wodja v. Wash. State Emps. Credit Union*,
  No. C15-5693 BHS, 2016 WL 3218832, (W.D. Wa. June 9, 2016) .........................9

**Statutes**

12 C.F.R. § 1005.17(b) .......................................................................10

15 U.S.C. § 1693e ...........................................................................13

Cal. Bus. & Prof. Code § 17200 *et seq*.,...................................................4

Cal. Civ. Code § 1719 .......................................................................23

Cal. Civ. Code §1770 *et seq* ...............................................................4

Cal. Penal Code § 476.......................................................................23

Cal.U.Com.Code, § 4104 .....................................................................18

**Regulations**

74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009)...............................................6

**INTRODUCTION**

Defendant Wells Fargo seeks dismissal of Plaintiffs' claims regarding three fee maximization practices used by Wells Fargo. But Judge Bashant has already denied a motion to dismiss in a case challenging the identical overdraft fee practice. *Lloyd v. Navy Federal Credit Union,* No. 17-cv-1280-BAS-RBB, 2018 WL 1757609, at *4 (S.D. Cal. Apr. 12, 2018); *see also Lloyd v. Navy Fed. Credit Union*, No. 17-CV-1280-BAS-RBB, 2019 WL 2269958, at *1 (S.D. Cal. May 28, 2019), *reconsideration denied in part*, No. 17-CV-1280-BAS-RBB, 2019 WL 2602516 (S.D. Cal. June 25, 2019) (granting final approval to $24.5 million class settlement). Judge Miller has already denied a defense motion for summary judgment in a similar case challenging fees on "balance inquiries" at out-of-network ATMs. *Figueroa v. Capital One, N.A.,* No. 18CV692 JM(BGS), 2019 WL 4962971, at *1 (S.D. Cal. Oct. 7, 2019). And—while outside this District—two federal courts and at least three state courts have denied motions to dismiss on identical "retry" NSF Fee claims. *Morris v. Bank of America, N.A*., No. 18-cv-157-RJC-DSC, 2019 WL 1274928 (W.D.N.C. Jan. 8, 2019), *report and recommendation adopted in part*, 2019 WL 1421166 (W.D.N.C. Mar. 29, 2019); *Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM, 2019 WL 7176777 (E.D. Ark. Oct. 21, 2019); *Garcia v. UMB Bank NA*, No. 1916-CV01874 (Jackson Co. Mo. Circuit Court Oct. 18, 2019), order and transcript attached hereto as Exhibit 1; *Tisdale v. Wilson Bank and Trust*, No. 19-400-BC (Tenn. Bus. Ct., Oct. 17, 2019), order and transcript attached hereto as Exhibit 2; *Ingram v. Teachers Credit Union*, No. 49D01-1908—PL-O35431 (Marion Sup. Ct. Feb. 18, 2020), order attached hereto as Exhibit 3. That precedential and persuasive case law provides ample support for denial of Defendant's Motion here.

**FACTUAL BACKGROUND**

Plaintiffs' claims arise from three, independent practices by Wells Fargo, each designed to maximize Wells Fargo's fees to the detriment of accountholders. First, Plaintiff Hartman challenges Wells Fargo's practice of assessing overdraft fees ("OD

Fees") on debit card transactions that *authorize* into a positive available balance but *settle*, days later, into a negative balance ("APPSN transactions"). Notably, Wells Fargo stopped charging OD Fees on these APPSN transactions after Plaintiffs filed their Complaint. Second, Plaintiff Lotsoff challenges Wells Fargo's practice of assessing more than one fee on the same item when it is re-submitted for payment multiple times. Because Wells Fargo's contract only permits it to assess one fee "per item," and because an "item" remains the same "item" even if processed multiple times, Wells Fargo breaches its contract when it charges more than one fee on the same "item." Finally, Plaintiff Hartman alleges Wells Fargo breaches its contract when it charges two or three out of network ATM Fees ("OON Fees") when a single balance inquiry is undertaken at out-of-network ATMs. While Plaintiff Hartman acknowledges Wells Fargo is permitted to assess balance inquiry fees when balance inquiries are made, it may not assess such fees on balance inquiries that were never requested by the accountholder. Plaintiffs bring claims for breach of contract, including breach of the covenant of good faith and fair dealing, violation of the Unfair Competition Law Cal. Bus. & Prof. Code § 17200 *et seq.*, and conversion.[1]

## LEGAL STANDARD

In ruling on a Rule 12(b)(6) motion, the court must accept as true the well-plead allegations and construe "those allegations in the light most favorable to the plaintiff." *Lloyd*, *supra*, 2018 WL 1757609, at *4.

## ARGUMENT

### I.   Wells Fargo Breached its Contract

#### A.   The Assessment of OD Fees on APPSN Transactions Is a Breach of the Account Agreement

Because *settlement*, for debit card purchases, does not always coincide with *authorization*, sometimes posting occurs days after a transaction has been made by a

---

[1] Plaintiff Lotsoff has elected *not* to pursue her claim under the Consumers Legal Remedies Act, Cal. Civ. Code §1770 *et seq.*

consumer. Assessing overdrafts when the bank posts the transaction means that a consumer can wind up owing hundreds of dollars in OD Fees for purchases that did not exceed the account balance at the time they were made. That is exactly what Wells Fargo did—up until shortly *after* Plaintiffs filed their Complaint, when it changed its practice and stopped charging OD Fees on APPSN transactions. *See* July 2019 Deposit Account Agreement, attached hereto as Ex. 4, at 26 ("We will track transactions that reduced your available balance while pending and caused overdraft fees on other transactions. If these transactions are presented for payment within 10 business days after they first appeared as pending, *we will waive any overdraft fees on those transactions*.") (emphasis added).

Holding banks to their representations and promises is particularly important in the overdraft context. As federal regulators have specifically cautioned, most consumers have little reason to expect that a debit card purchase made when an account contains sufficient funds could result in an OD Fee simply because a later, unrelated transaction pushes the account into the red before the bank has settled the earlier charge. Because this practice results in the "stacking" of OD Fees that can cause substantial harm to consumers—especially those at the low-income end of the banking population—a bank like Wells Fargo that intends to employ this practice cannot misrepresent its true practices in the account contract.  That is why the CFPB has said the exact APPSN fee practice used by Wells Fargo is unfair if not appropriately and expressly disclosed. Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

### 1.    Wells Fargo's Account Agreement Promises to Determine Overdrafts at Authorization

In *Lloyd*, 2018 WL 1757609 at *7, Judge Bashant denied a motion to dismiss in a case challenging the exact APPSN practice, holding that it was reasonable to understand the credit union's disclosures as promising that "a transaction that was not authorized as an overdraft, such as those the Plaintiffs allege, would not incur an overdraft fee."  The Wells Fargo disclosures here make even more explicit promises that transactions authorized into a positive balance cannot incur an OD Fee.

First, Wells Fargo promises to immediately place debit holds on positive funds at the moment of authorization, promises it uses available balance to determine overdrafts, promises it immediately deducts debit card transactions from available balance, promises those held funds are not available for use for other, later transactions, and promises holds stay in place until payment. If Wells Fargo places a debit hold on funds at the moment of authorization, there cannot reasonably be an overdraft on that transaction because there are *always* sufficient available funds to cover it and it never results in a negative available balance:

> For all card purchase transactions, **we may place a temporary hold on some or all of the funds in the account** linked to your card when we obtain an authorization request. We refer to this temporary hold as an "authorization hold." **The funds subject to the hold will be subtracted from your available balance.** We can place an authorization hold on your account for up to 3 business days (or for up to 30 business days for certain types of debit or ATM card transactions, including car rental, cash, and international transactions) from the time of the authorization or until the transaction is paid from your account.

FAC, Ex. B at 40 (emphasis added).

Second, Wells promises overdrafts are determined when Wells Fargo decides to "approve" a debit card transaction, which is at the moment of authorization:

> The [overdraft] service allows Wells Fargo **to approve** (at our discretion) your ATM and everyday (one-time) debit card transaction if you do not have enough money to cover your transaction in your checking account or in accounts linked for Overdraft Protection. If you add this service, **we may approve these transactions into overdraft and allow you to continue with your** ATM withdrawal or **everyday debit card transaction.**

*Id.* at 20 (emphasis added). For debit card transactions, Wells Fargo chooses to "allow you to continue with your transaction" *only at the time of authorization*. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a bank authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

Third, using the phrase "to cover," Wells states:

> The [overdraft] service allows Wells Fargo to approve (at our discretion) your ATM and everyday (one-time) debit card transaction if you do not have enough money **to cover your transaction** in your checking account or in accounts linked for Overdraft Protection.

FAC, Ex. B at 20 (emphasis added).

These disclosures all mean one thing: debit card transactions approved into a positive available balance cannot incur overdraft fees because they are already "covered."  Judge Bashant evaluated disclosures substantially equivalent to the second two disclosures quoted above, and rejected the same arguments Wells Fargo makes here:

> Plaintiffs point to the provision appearing in both the Opt-In Form and Important Disclosures which states that "[w]e pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined and/or your check/ACH will be returned." **A reasonable reading of this provision is that it links authorization of a transaction with payment of the transaction, and particularly with respect to Navy Federal's authorization and payment of a transaction that results in an overdraft. If this is the case, then whether a transaction is an overdraft that Navy Federal pays is determined at authorization.**

*Lloyd*, 2018 WL 1757609, at *7 (emphasis added).  The phrase "authorize and pay" is substantially the same as Wells Fargo's phrase "approve."  *See also Kelly v. Community Bank, N.A.*, No. 8:19-cv-00919-MAD-CFH at *12 (N.D.N.Y. Feb. 18, 2020), attached hereto as Exhibit 5 (finding contract that promised that overdraft fees were determined when the bank "authorized and paid" debit card transactions ambiguous because "it is equally reasonable to understand that an overdraft fee is assessed at the time Defendant elects to make the payment, as Plaintiff asserts, or that an overdraft fee is assessed at the time of settlement of the transaction, as Defendant asserts.").

In *Lloyd*, Judge Bashant also relied on the fact that Navy Federal did not define the key term "to cover" an overdraft, and that lack of a definition was crucial:

> **Based on a review of the Account Agreements, the Court finds that the term "to cover" is ambiguous** . . . [T]he provision in which "to cover" appears contains [an] ambiguity. The provision uses the term "transaction" with no qualification. **[It] can thus be fairly read to include either a consumer's transaction with a merchant (*i.e.*, authorization of the transaction) or Navy Federal's transaction with a merchant (*i.e.*, settlement with the merchant).** The former reading would lend support

to Plaintiffs' breach of contract claim by tethering Navy Federal's overdraft determination to the point when Navy Federal authorizes the transaction. **In the face of contractual ambiguities, Plaintiffs offer a reasonable interpretation of the term "to cover," in the context of other provisions in the Account Agreements, which would foreclose overdraft fees on the debit card transactions at issue here**.

*Id.* (emphasis added).  Identical reasoning applies here. Wells Fargo uses the same, ambiguous term numerous times.  Just as in *Lloyd*, the phrase "to cover your transaction" reasonably refers to the *consumer's* transaction with the merchant (i.e. authorization of the transaction). In this way, Wells Fargo again tethers the overdraft determination to authorization. *See id.*

While there is no need for this Court to look any further than *Lloyd* to complete its analysis on Plaintiff's APPSN claim, it bears noting that Judge Bashant is in good company. Numerous other courts, including the Second Circuit, have denied motions to dismiss when analyzing the identical fee practice and similar disclosures for similar reasons as Judge Bashant did in *Lloyd*. *See, e.g., Roberts v. Capital One, N.A.,* 719 F. App'x 33, 35-36 (2d Cir. 2017) (Reversing the district court's dismissal on a motion to dismiss and holding that the Bank's "preferred 'interpretation of the agreement ... makes little sense from [the account-holder's] point of view,' as a reasonable consumer likely considers something to have been paid for when they swipe their debit card, not when their bank's back-office operations are completed."); *Bodnar v. Bank of Am., N.A.*, No. 14:cv-03224, Doc. 30 (E.D. Pa. Oct. 15, 2014); *Clark v. Hills Bank and Trust,* No. LACV080753 (Johnson County, Iowa) (attached hereto as Exhibit 6); *Haskell v. UMB Bank, N.A.* (Jefferson County, Missouri).[2] This Court should similarly deny Wells Fargo's Motion.

[2] *But see Boone v. MB Financial*, No. 18-CV-1771, 2019 WL 1584553 (N.D. Ill. Apr. 12, 2019), in which the court granted a motion to dismiss similar OD Fee claims, declining to following the holdings in *Capital One, Lloyd*, and other cases.  First, the case is an outlier and unpersuasive. Second, the order relied on the fact that the bank disclosures there failed to promise that "debit holds" were placed immediately.  As above, Wells makes precisely that representation.

At the very least, Wells Fargo's disclosures are ambiguous. And as the aforementioned orders demonstrate, ambiguities and misleading descriptions of banks' overdraft balance-calculation methods contained in account contracts support consumer claims for recovery of improperly assessed OD Fees, at this at this stage of the litigation.[3] A bank's account contract that "contain[s] no provision" defining a key term in dispute, or that requires searching for "contractual hints" scattered throughout the documents is open to two "reasonable . . . interpretations." *Ramirez v. Baxter Credit Union*, No. 16-cv-03765-SI, 2017 WL1064991, at *5 (N.D. Cal. Mar. 21, 2017). Because Plaintiffs put forth a plausible interpretation of the contract, dismissal at this early stage is unwarranted.

If the Court finds Wells Fargo's contractual terms are replete with gaps, or that it abused discretion, the law requires the parties to act in good faith to fill the gaps. Wells Fargo, however, has failed to fill in these gaps, or use its discretion fairly. Instead, Wells Fargo has abused its contractual discretion by interpreting undefined terms in an unreasonable manner to extract OD Fees on transactions that no consumer would reasonably believe could cause OD Fees, and it has abused discretion by using funds it "held" for specific debit card transactions to be used to pay for *other*, unrelated transactions. Thus, Plaintiff Hartman plausibly states a claim that her reasonable expectations were violated, and that Wells Fargo breached the implied covenant of good faith and fair dealing as well.

---

[3] *See also In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 24 (D.S.C. 2015) (denying motion to dismiss overdraft claims because the contract used "imprecise" terms); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 854 (W.D. Mich. 2016) (declining to dismiss because the bank's contract failed to define the key terms); *Gunter v. United Fed. Credit Union*, No. 3:15-cv-00483-MMD-WGC, 2016 WL 3457009, at *3 (D. Nev. June 22, 2016) (contract was ambiguous when it failed to clearly address "how the credit union determines when an overdraft has occurred"); *Wodja v. Wash. State Emps. Credit Union*, No. C15-5693 BHS, 2016 WL 3218832, at *3 (W.D. Wa. June 9, 2016) (denying motion to dismiss in overdraft case based on contractual ambiguity).

## 2.    Wells Fargo's Arguments Are Not Compelling

Wells Fargo argues that Plaintiff's interpretation of the contract is invalid for two reasons.  While Wells Fargo admits that it immediately places debit holds, it first argues that overdrafts cannot be determined at the time of authorization because, according to the contract, "[i]n some situations, the amount of the hold may differ from the actual transaction amount since the merchant may not know the total amount you will spend." Ex. B at 40. This is a red herring. As is clear from the FAC, that is not what happened to Plaintiff.  Indeed, that rare occurrence where the authorized amount does not match settlement amount (less than 5% of debit card transactions) has nothing to do with Plaintiffs' case.  And nowhere does the provision disclose that Wells Fargo will charge OD Fees on transactions for which the sufficient available funds are held immediately.

Wells Fargo next relies on another inapplicable provision. To understand why it is inapplicable, some background is necessary. Regulation E requires accountholders to affirmatively opt-in to Wells Fargo's optional overdraft coverage. 12 C.F.R. § 1005.17(b).  If an accountholder does not opt-in a bank may not authorize "one-time" debit card transactions into overdraft (the regulation distinguishes between one-time debit card transactions and recurring debit card transactions, like gym memberships), but it may still authorize overdrafts on all *other* transaction types. *Id.* Wells Fargo's contract calls this its "standard overdraft coverage." Wells Fargo also allows accountholders to remove this standard coverage from an account and thus instruct Wells Fargo not to authorize any overdrafts whatsoever. *Plaintiff Hartman did not remove this coverage.* Yet the provision Wells Fargo now claims authorizes OD Fees on APPSN transactions exclusively concerns consumers who have made such an instruction.  This is evident from the full context of the provision, which Wells Fargo omits in its Motion:

> Important: **If you remove our standard overdraft coverage from your account,** the following will apply if you do not have enough money in your account or accounts linked for Overdraft Protection to cover a transaction . . . **We will not authorize certain transactions (such as cashed checks, recurring debit card transactions, or Bill Pay transactions) into overdraft. However, if these transactions** are authorized when your account has enough money but are later presented for payment when your

account does not have enough money, we will pay the transaction into overdraft and charge an overdraft fee.

FAC, Ex. B at 20-21.

For that reason alone, it is irrelevant.  It is doubly irrelevant because the provision only concerns "recurring" debit card transactions, not the one-time debit card transaction at issue here.  Obviously, a contract provision exclusively directed at persons other than Plaintiff Hartman (those who have removed the standard overdraft coverage) cannot possibly affect her contract rights—any more than a provision regarding safe deposit boxes could apply to her if she never had one.

Nor does the provision provide some sort of broad warning to consumers regarding Wells Fargo's debit card fee practices in general.  To the contrary, the fact that Wells Fargo makes an APPSN warning for accountholders who have removed standard overdraft coverage from their accounts, but *not* for accountholders who have made different overdraft selections, means, according to well-worn contract principles, that Wells Fargo intended such a warning *not* to apply to consumers like Plaintiff Hartman. Wells Fargo clearly knew how to disclose APPSN for a very limited group of accountholders. That the Bank failed to do so with respect to the accountholders or debit card transactions at issue here indicates that the Bank did not intend to do so. When the Bank says one and only one type of transaction can experience APPSN fees, and does not say that for the type of transaction at issue in this case, that silence must be understood to be intentional. *See Murphy v. DirecTV, Inc.,* 724 F.3d 1218, 1234 (9th Cir. 2013) (Applying the well-known rule of contract interpretation, "*expressio unius est exclusio alterius*; i.e., that mention of one matter implies the exclusion of all others [as an] an aid to resolve the ambiguities of a contract.").[4]

---

[4] Notably, Wells Fargo's *current* account agreement, which announces that Wells Fargo has ceased the practice at the heart of this lawsuit (*see* Ex. 4 at 26) *still includes the disclaimer that it now relies upon in its Motion. See* Ex. 4 at 28.  The fact that the two disclosures coexist in Wells Fargo's contract today—one which promises to waive all OD Fees on APPSN transactions, and the second which warns a certain subset of

Recognizing the complexity of the APPSN process and the fact that a fee in such a circumstance is counterintuitive to accountholders, the industry generally provides a detailed, express warning for when and how APPSN fees can occur on all types of debit card transactions.  For example, Bank of America's Deposit Agreement states: "If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant  .  .  .  and you may incur an overdraft fee." *See* https://www.bankofamerica.com/deposits/resources/deposit-agreements.go.   Likewise, Capital One explains, "Other intervening transactions that occur while authorized debit card transactions are pending may create overdrafts on your account" and proceeds to provide an example for how APPSN transactions occur. *See* https://www.capitalone.com/bank/rules-governing/disclosures/.

It is in this context that the disclosure relied upon by Wells Fargo must be understood. Reasonable accountholders cannot anticipate that any APPSN transactions will incur OD Fees.  It is an exception to this rule when Wells Fargo attempts to disclose such fees for a particular subset of APPSN transactions:  those made by accountholders who (unlike Plaintiff) have opted out of Standard OD Protection and who (unlike Plaintiff) made a recurring debit card transaction. The fact that Wells Fargo discloses APPSN OD Fees for certain other consumers for these certain other transactions, but does not do so for the accountholders and transactions actually at issue in this lawsuit is dispositive in Plaintiffs' favor.

**B.      Wells Fargo Breaches its Contract When It Charges Two Fees on the Same Item**

Wells Fargo does not dispute that it charged Plaintiff multiple fees on the same attempted payment but instead summarily argues that its contract authorizes the repeat

---

consumers (those who remove  standard OD protection) about OD Fees on a certain subset of transactions (recurring debit card transactions) is as decisive evidence as any that the disclosure Wells Fargo relies on is irrelevant to Plaintiff's claims.


fees. But Wells Fargo does not and cannot point to a single provision of the contract that unambiguously authorizes it to charge a fee *each time* an item is re-processed or re-presented. Under the plain terms of the contract, Wells Fargo is only authorized to charge one fee per item, and this Court should deny the Motion.

### 1. Wells Fargo Promises to Charge a Single NSF Fee Or OD Fee on an Insufficient Funds Item

#### a. ACH Payment Background

The NACHA is "a transaction processing system that facilitates electronic transfer of funds between financial institutions, usually on behalf of account holders." *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 328, 332 (4th Cir. 2017). Tens of millions of Americans use the system to automatically deposit their paychecks or to make either one-time or recurring electronic payments. *See What is ACH?*, NACHA, https://perma.cc/EG97-JZS2 (last visited Jan. 3, 2020). To *initiate* an ACH payment from a consumer's account, a merchant must first obtain the consumer's account information and authorization to transfer funds. *See* 15 U.S.C. § 1693e. The Electronic Funds Transfers Act (the "EFTA") requires that the consumer's authorization be "in writing." *Id.* Once authorization is obtained, the merchant's financial institution can submit a request for payment to the ACH network, which is forwarded by the network to the consumer's bank or credit union. *See History of Nacha and the ACH Network*, NACHA (Apr. 20, 2019), https://perma.cc/YJW5-Q6NY. If all goes smoothly, the consumer's bank or credit union will then debit the consumer's account for the amount of the payment. *See id.*

But all does not always go smoothly. Rules set forth by NACHA—a self-regulatory organization that manages the ACH network—allow a bank to "return" an ACH payment request for "any reason" (including insufficient funds). NACHA, Operating Rules & Guidelines § 3.8 (2013). Under NACHA's terminology, a request for payment via the ACH network is called an "*Entry*," and a bank's return of an "Entry" without payment is called a "*Return Entry*." *See id.* §§ 8.33, 8.79. When an entry is

returned for insufficient funds, NACHA's rules allow a merchant to make additional attempts to obtain payment by "re-presenting" (or "reinitiating") the returned entry. *See id.* § 2.12.4.2. To ensure that the receiving bank recognizes that the merchant's payment request is a "re-presented" entry *rather than a new one*, the request must "contain the identical data as the original" entry and include the label "RETRY PYMT." *See id.* App. 4. The rules prohibit a merchant from altering a previously returned entry to look like a new entry. *Id.*

When consumers authorize ACH payments for which they lack funds in their accounts, banks may advance the money to cover the amount of the overdraft—a service for which they typically charge an OD Fee—or they can choose to reject the payment and assess an NSF Fee. *See* Consumer Financial Protection Bureau (CFPB), *A Closer Look: Overdraft and the Impact of Opting-In* (2017), https://perma.cc/V8ME-KKGF. In addition, the merchant whose payment request was returned may impose its own fee. NACHA's rules, however, permit the merchant to charge only <u>one</u> such fee for a single "returned entry," *even if the merchant re-presents that entry multiple times*. *See* NACHA Operating Rules & Guideline § 2.14.4.

### b.     Wells Fargo Breaches its Contract

Wells Fargo promises it will assess one, $35 fee per "item." FAC, Ex. C. The key question, then, is what is an "item?" In Plaintiffs' reasonable view, an "item" does not become a new "item" merely because it is reprocessed, both because it is the same payment and because the accountholder has only made one instruction to pay it. Accordingly, Wells Fargo's promise means it will charge a single fee per item, even if the item is reprocessed numerous times by Wells Fargo.  Wells Fargo takes the opposite view: that for fee assessment purposes, each time the same payment is reprocessed or re-presented, it transmogrifies into a new "item." But the contract does not unambiguously support Wells Fargo's view.

<u>**First**</u>, "item" is a defined term in the agreement. Wells Fargo defines "item" as an "order, instruction or authorization to withdraw or pay funds or money from an

account," *each of which can only derive from the accountholder*.  Only an accountholder may make an "order" or "instruction" for payment from his or her account; simply put, a merchant cannot issue an order or instruction. A merchant's resubmission of an accountholder's original "order" or "instruction" is *not*, in it of itself, a new "order to pay money," but a third party's request to collect a *previous* such order.  In sum, a second or third attempt by a third party to withdraw money from an account is not an "item" as that word is defined in Wells Fargo's contract, and therefore the bank may not charge an additional fee on it.

**Second**, this understanding of the term "item" is further bolstered by another contractual provision, which Wells Fargo wrongfully relies on in its Motion:

> You hereby authorize any Originating Depository Financial Institution (ODFI) to initiate, pursuant to ACH Operating Rules, ACH debit entries to your account *for presentment or re-presentment of items* written or authorized by you.

FAC, Ex. B. at 47 (emphasis added). According to the plain terms of this provision, an "item" does *not* (contrary to Wells Fargo's current argument) become a *new* item when it is "re-presented."  The provision highlights that Wells Fargo understands full well the distinction between a newly presented item, and a "re-presented" item and it underscores that an "item" may be "presented" and "re-presented"—and it is still the same item. If a re-presented "item" constituted a new "item," the word "re-presentment" in the above disclosure would be rendered superfluous. *Cf ASARCO, LLC v. Union Pac. R. Co.,* 765 F.3d 999, 1010 (9th Cir. 2014) ("[E]very word, phrase or term of a contract must be given effect, and courts should avoid accepting interpretations  that render part of the writing superfluous."). Why distinguish between the "presentment" and "re-presentment" of items at all if Wells Fargo intended to treat all such transactions the same? Thus, it is false that, as Wells Fargo argues, the contract says each time an ACH transaction is presented or represented for payment, it is considered a separate item. The quoted provision says the opposite.

Wells Fargo argues that because the word "item" is used in the plural in the above passage, the re-presentment of an item constitutes a separate "item" under the agreement. The argument goes too far. That the word "item" is used in the plural in the above passage is indicative only of the fact that the Wells Fargo lawyers who drafted the agreement are aware of basic grammar rules. The provision authorizes numerous ACH debits—a gym membership, a gas bill, an insurance payment. If the sentence had been written in the singular, rather than the plural, consumers would only be authorizing an ODFI to deduct only one item from their account during the entire life of the account—a result that makes no sense.

If Wells Fargo intends to utilize a peculiar, unconventional interpretation of the term "item," it must expressly disclose this interpretation in the contract and in a manner that reasonable accountholders understand (like its competitors have done). For this reason, courts across the country that have analyzed similar contracts and identical multiple fee assessment practices have upheld the plaintiffs' claims and denied the financial institutions' motions to dismiss. *See, e.g., Morris*, 2019 WL 1274928 (denying MTD where bank made single fee "per item" promise); *Tannehill*, 2019 WL 7176777 (same); *Tisdale,* Ex , (same); *Garcia,* Ex. 1(same), *Teachers*, Ex. 3. [5] This Court should do the same.

---

[5] *But see Lambert v. Navy Federal Credit Union*, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019), which is on appeal. In *Lambert*, the district court's conclusion turned on its understanding of the term "debit item." Because the contract listed "Automated Clearing House (ACH) debits" as one such "item," the court incorrectly thought it "clear . . . that ACH debit *requests*, such as the two submitted by [plaintiff's] insurer, qualify as 'debit items.'" *Id.* But the court did not explain how it read the contract's reference to a customer's ACH "*debits*" as unambiguously including a third party's "debit *request*." Further, the court incorrectly analogized to a re-processed debit item as equivalent to a second check, written after the first check bounced. *Id.* at *4. That analogy crumbles, however, given that a re-processed item is equivalent to submitting the same bounced check for payment over and over. *Id.* Ultimately, that case is an outlier and its analysis is unpersuasive here.

### 2.    Plaintiff's Interpretation of the Contract is More Reasonable Than Defendant's.

In the context of the contractual provisions discussed above, Wells Fargo's definition of the term "item" must be understood as *a customer's* "promise" or "order to pay funds" from the customer's account. Because Plaintiff authorized only a single payment, the contract allows Wells Fargo to charge her, at most, a single fee on that payment. An "item" is still the same "item" even if reprocessed multiple times. This conclusion accords with both the banking industry's use of the term "item" and its industry usage, as evidence by the NACHA Rules, discussed below.

#### a.    Banks and Credit Unions Use the Term "Item" in the Plain, Commonsense Way Plaintiff Urge.

Wells Fargo's multiple fee practice is not universal. For example, Chase—the largest consumer bank in the country—charges one fee per item, no matter how many times that item is reprocessed. Financial institutions that do engage in the same abusive multiple fee practice as Wells Fargo's, however, at least expressly disclose the practice and require accountholders to agree to it. For example, First Citizens Bank expressly discloses, "[b]ecause we may charge a service fee for an NSF item each time it is presented, *we may charge you more than one service fee for any given item*." As another example, First Hawaiian Bank, expressly states: "YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**." The list goes on.[6]

In short, there is broad evidence throughout the industry that shows the multiple fee practice used by Wells Fargo is disclosed expressly, and industry usage helps contextualize Wells Fargo's contractual definition of the term "item." Indeed, the sample disclosures reproduced above and in the FAC would be nonsensical if the term "item"

---

[6] *See* FAC ¶¶ 101-103. A compendium of other industry disclosures is also attached as Exhibit 7.

had the meaning that Wells Fargo's now imputes to it: that an "item" becomes a new "item" each time it is reprocessed. If each presentation were itself a separate "item," the disclosures in these contracts would make no sense.

### b.   Payment Association Rules Support Plaintiff's Interpretation of the Account Documents.

Plaintiff's interpretation of the term "item" is also consistent with the Rules set forth by NACHA, which are designed to govern ACH transactions and which are incorporated by reference in the contract. *See* FAC, Ex. A at 14.

Under the NACHA rules' terminology, a merchant's request for payment via the ACH network, pursuant to an instruction for payment by the consumer, is called an "Entry," which "*shall be deemed an 'item'* within the meaning of" the UCC. *Id.* at § 8.33 (emphasis added). The California UCC definition, codified by statute, is: "'Item' means an instrument or a promise or order to pay money handled by a bank for collection or payment." Cal.U.Com.Code, § 4104, subd. (a) (9). This too supports the conclusion that only an accountholder can create an item—even if merchants can attempt to collect on that same item numerous times.  Again, only an accountholder can give an "instruction" for payment.

Importantly, NACHA's rules prohibit a merchant from altering a re-presented entry in an attempt to make it look like a consumer has authorized a new payment request. *See ACH Operations Bulletin #1-2014: Questionable ACH Debit Origination: Roles and Responsibilities of ODFIs and RDFIs*, NACHA (2014), https://perma.cc/A4PF-PWMR. The rules thus make clear that a "re-presented" entry is a request for payment of the original entry, not a separate entry (or "item") that may trigger an additional NSF Fee.  It was precisely these NACHA rules, and their complexity, that led the court in *Tannehill,* 2019 WL 7176777, at *1, to deny a motion to dismiss in an identical case ("the rather complicated ACH rules," meant "the Court [was] unable . . . to hold unequivocally at the threshold that [Plaintiff's] breach claim fails as a matter of law.").

1    In sum, the contractual disclosures, common sense, and industry usage
2    demonstrate that an "item" cannot become a new "item" when Wells Fargo returns and
3    reprocesses it one or more times. At best, the term "item" is ambiguous. Because the
4    meaning of an ambiguous contract term is a question of fact, the Motion to Dismiss must
5    be denied.

6         **3.    Wells Fargo Breached the Covenant of Good Faith and Fair
7              Dealing When it Assessed Multiple Fees on the Same Item**

8    The implied covenant of good faith and fair dealing is present in all contracts.
9    *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 937 (9th Cir. 1999). Under California
10   law, "[b]ad faith sufficient to constitute a breach of the covenant of good faith and fair
11   dealing includes conduct described as 'inaction,' 'subterfuge,' 'lack of diligence,'
12   'evasion of the spirit of the bargain,' and 'abuse of power.'" *Best Buy Stores, L.P. v.*
13   *Manteca Lifestyle Center, LLC*, 859 F. Supp. 2d 1138, 1152 (E.D. Cal. 2012) (citation
14   omitted).

15   The FAC outlines clear abuses of contractual discretion. Wells Fargo's contract
16   is silent as to its policy to treat each reprocessing of a payment as a "new" item for
17   purposes of assessing another fee. Wells Fargo exploits this silence to its
18   accountholders' detriment, in breach of its duty of good faith and fair dealing. It was bad
19   faith and totally outside Plaintiff's reasonable expectations for Wells Fargo to define the
20   term "item" as it did and assess $70 or more in bank fees for a single payment.

21   Wells Fargo engages in a bad faith pattern of rejecting, then approving, the same
22   item, assessing a fee each time in order to maximize fee revenue. With respect to Plaintiff
23   Lotsoff, Wells Fargo initially denied the payment, charging an OD Fee, then approve,
24   the same item, charging an NSF Fee. Wells Fargo had no basis to charge these
25   duplicative fees except greed; indeed, it could simply have paid the item into overdraft
26   on the first payment attempt (as it later did) and saved Plaintiff $35 in fees. The deny,
27   then approve scheme is another instance of bad faith.

28

**C.     Wells Fargo Breaches Its Contract When It Charges Numerous Balance Inquiries on a Single Balance Inquiry**

### 1.     Express Breach

With respect to Plaintiffs' OON Fee claims, Wells Fargo misunderstands Plaintiffs' allegations. Plaintiffs concede that Wells Fargo may charge a $2 fee for those customers who actually perform a balance inquiry at an out-of-network ATM. What Wells Fargo may *not* do is charge *two or three* balance inquiry fees for only *one* balance inquiry, when it knows full well that these *additional* "balance inquiries" were never requested by the accountholder. Put simply, it is a straightforward breach of contract for Wells Fargo to charge balance inquiry fees for phantom balance inquiries that consumers never performed—and Wells Fargo knows full well no consumer in her right might would undertake more than one balance inquiry during the same ATM use.

Take what happened to Plaintiff Hartman. Plaintiff Hartman used an FCTI ATM to make a $20 cash withdrawal and undertake a single balance inquiry. FAC ¶ 244. Following her transaction, Plaintiff Hartman was assessed, in addition to the cash withdrawal surcharge paid to FCTI ($2.95), an additional $2.50 fee from Wells Fargo for making an out-of-network cash withdrawal, and *two separate $2.00 fees* from Wells Fargo for making out-of-network balance inquiries, despite making and consenting to one, single balance inquiry. *Id.*

There is no conceivable justification for the second balance inquiry fee, which was never requested by Plaintiff Hartman or other consumers. It is a breach of contract for Wells Fargo to assess two balance inquiry fees when only one balance inquiry was ever performed.

In its Motion, Wells Fargo attempts to shift the blame to FCTI for its role in the double-billing scheme. Such blame-shifting is inappropriate for a breach of contract claim, especially prior to discovery. Notably, Wells Fargo does not cite to any authority for its position that the liability of a third party may excuse a contractual breach. To be clear, Plaintiff does not concede that Wells Fargo is without fault in this situation. In

Plaintiff's view, Wells Fargo knew or should have known full well that Plaintiff only undertook a single balance inquiry and knew the scheme FCTI was employing—a scheme from which both FCTI and Wells Fargo profited enormously. Discovery will unearth more evidence of this.

Regardless, it was Wells Fargo who breached its contract with Plaintiff Hartman when it charged her balance inquiry fees for balance inquiries that she did not perform. For a breach of contract claim, intent is not required. *Ronpak, Inc. v. Elecs. for Imaging, Inc.*, No. 14-CV-04058-JST, 2015 WL 179560, at \*4 (N.D. Cal. Jan. 14, 2015) (Noting a breach of contract claim "does not require intent to defraud.") Thus, even if Wells Fargo's factual argument were true, the Motion to Dismiss Plaintiff's OON Fee claims must be denied.

In *Figueroa*, 2019 WL 4962971 (S.D. Cal. Oct. 7, 2019), Judge Miller recently denied Capital One's motion for partial summary judgment in a case challenging Capital One's assessment of balance inquiry fees. While that case dealt with Capital One's ambiguous disclosures with respect to the Bank's assessment of balance inquiry fees on balance inquiries undertaken in conjunction with a cash withdrawal, Judge Miller helpfully highlighted that the central purpose of a bank's contractual disclosures "is to provide account holders with adequate notice of fees." *Id.* at \*10. When those disclosures lack clarity, and when a bank assesses balance inquiry fees in an unexpected manner, a plaintiff's claim for breach of contract ought not to be dismissed. *See id*. The same holds true here.

### 2. Wells Fargo Breached the Covenant of Good Faith and Fair Dealing In Assessing Two Balance Inquiry Fees

Wells Fargo's contract never authorizes balance inquiry fees when supposed "balance inquiries" were never even requested by accountholders. Wells Fargo abused discretion when it assessed two balance inquiry fees on only one balance inquiry. This is *per se* unreasonable and indeed impossible. As Wells Fargo knew or should have known, Plaintiff never requested two balance inquiries during a single ATM use, and

1  she should never have been charged two such fees. Because Wells Fargo unreasonably
2  used its discretion to assess two balance inquiry fees on only one balance inquiry,
3  Plaintiffs have adequately stated a claim for breach of the implied covenant.

4  **II.    The Motion to Dismiss The Causes of Action Under § 17200 Should Be
5           Denied**

6          The UCL is to be "liberally construed and applied" to promote its underlying
7  purpose of consumer protection. *Herron v. Best Buy Co., Inc.*, 924 F.Supp.2d 1161, 1172
8  (E.D. Cal. 2013) (citation omitted). Here, Plaintiffs adequately state a claim under the
9  "fraudulent" and "unfair" prongs of the UCL for each of the three theories of liability
10 advanced in the FAC.

11         **A.    Lotsoff And The Multiple Fee Class State A Claim Under The UCL**

12         Lotsoff states a viable claim under the "fraudulent" and "unfair" prongs of the
13 UCL because, as discussed above, Wells Fargo misrepresents that it will not charge more
14 than one fee on the same item. FAC ¶¶ 84-89, 96-98, 302-303. Here, Lotsoff had a
15 reasonable expectation that Wells Fargo would not charge more than one fee on the same
16 item. Yet Wells Fargo did so anyway in violation of the account documents and with no
17 other justification than to increase its fee revenue. Wells Fargo therefore deceived
18 Lotsoff and other accountholders and violated the UCL.

19         Wells Fargo's lip service to the "legislative goal" of "discouraging banking
20 customers from dishonoring their payment obligations to merchants" (Mot. at 18) is
21 preposterous *because its assessment of numerous fees of up to $105 total on the same
22 item does precisely the opposite*—it places consumers, many of whom are already
23 struggling to make ends meet, at greater risk of failing to meet their obligations. *See*
24 ¶ 74.[7]  Moreover, consumers cannot reasonably expect to be charged multiple times and

---

[7] These fees fall disproportionately on racial and ethnic minorities, the elderly, and the
young—indeed the most vulnerable segments of society. *See* http://www.pewtrusts.org/
~/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf.

thus cannot be expected to take preventive measures against dishonoring payments.[8] The harm to the putative class very clearly outweighs the singular goal of Wells Fargo's conduct: corporate profit.

## B.      Hartman And The OON Class State A Claim Under The UCL

Hartman and OON Class also state a claim under the "unfair" and "fraudulent" prongs of the UCL. Wells Fargo's material misrepresentations and omissions with regard to its practice of charging multiple OON fees in connection with purported balance inquiries at out-of-network ATMs constitutes both unfair and fraudulent business practices under the UCL. Plaintiff pleads with particularity how Wells Fargo misled consumers into believing they would only be charged balance inquiry fees on balance inquires they chose to undertake. *See* FAC ¶¶ 198-244.

Contrary to Wells Fargo's argument, numerous paragraphs in the FAC adequately allege causation. Indeed, as alleged throughout the FAC, Hartman and OON Class Members never would have knowingly paid for *two* balance inquiries. *See, e.g.*, FAC ¶¶ 177, 311.

Wells Fargo's attempt to place all blame on Defendant FCTI defies the well-pled allegations of the FAC and, at minimum, presents a legitimate question of fact that cannot be resolved on the pleadings. *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938–39 (9th Cir. 2008) (Whether a business practice is deceptive is usually a question of fact not appropriate for decision on a motion to dismiss). Wells Fargo argues that Plaintiff has not demonstrated that "Wells Fargo's conduct *caused* the harm at issue." Mot. at 18 (emphasis in original). But it is commonsense that a causal nexus exists

---

[8] Wells Fargo's reliance on Cal. Penal Code § 476 and Civ. Code § 1719 is of no moment. Penal Code § 476 involves check forgery, which is completely unrelated to this case. Civ. Code § 1719 involves the situation in which a person attempts to pass a check on insufficient funds, thereby deceiving the receiver into providing goods or services (or removing debt) before the check is ultimately rejected. Here, there is no possibility that Well Fargo was fooled by an ACH on insufficient funds because, unlike a physical check, Wells Fargo knows immediately when the ACH is authorized whether there are sufficient funds in the account. This is precisely how Wells Fargo knows to reject the ACH transaction in the first place. Thus, Wells Fargo is never fooled or harmed because it is never tricked into disbursing funds.

between Wells Fargo's expressed promise to charge balance inquiry fees on balance inquiries and its actual conduct of assessing multiple balance inquiry fees *on balance inquiries that never occurred*. The specifics of whatever communication occurs between the ATM operator and Wells Fargo is irrelevant as Wells Fargo does not deny that it is the one that chooses to assess OON Fees and it is the one that benefits from them.

With respect to the "balancing test," Hartman has alleged that the challenged OON Fee practice is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to consumers. FAC ¶ 316. Moreover, the harm to putative class members is outweighed by the utility (if any) of Defendant's collection of multiple fees for single ATM transactions. FAC ¶¶ 314-315.

### C. Hartman And The APPSN Class State A Claim Under The UCL

Finally, Hartman's and the APPSN Class's UCL claims based on the "unfair" and "fraudulent" prongs meet the heightened pleading standard of Rule 9(b) by identifying Wells Fargo's wrongful conduct and its harm to Hartman and class members. FAC ¶¶ 329-335. The FAC identifies numerous misrepresentations and omissions found in the account documents pertaining to APPSN transactions, and specifically describes Wells Fargo's practice of falsely indicating in account documents that OD Fees will not be charged when sufficient funds exist to cover transactions. *See* FAC ¶¶ 34-55. For example, Hartman highlights the portions of Defendant's account documents that mislead consumers into believing "that Wells Fargo will only charge overdraft fees on transactions that have insufficient funds to "cover" that transaction" (FAC ¶ 27), only in turn to fraudulently charge overdrafts on APPSN transactions. *See also* FAC ¶ 36. As such, Hartman's claim under the "fraudulent" prong is properly stated. *See Hawthorne v. Umpqua Bank*, No. C-11-6700 YGR, 2012 WL 1458194, at *2 (N.D. Cal. Apr. 26, 2012) (fraudulent prong claim upheld where plaintiff alleged bank used misleading account agreements).

Hartman further alleges that she (and reasonable consumers like her) were deceived by Wells Fargo and harmed by the wrongful assessment of OD Fees to APPSN

transactions. FAC ¶¶ 26, 34-55, 330, 334, 335.  In doing so, she identifies specific misrepresentations and omissions, the materiality of which "is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.'" *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (citation omitted); *Lloyd*, 2018 WL 1757609, at *16 (materiality of misrepresentation and thus whether "business practice is deceptive is usually a question of fact not appropriate for decision on a motion to dismiss.").

Further, Wells Fargo's practice of charging OD Fees on APPSN transactions contravenes the public policy expressed by the CFPB. *See* FAC ¶ 24. This is sufficient to state a claim under the UCL's "unfair prong."

### III. Hartman And The FCTI ATM Class State A Claim For Conversion

Under California law, a conversion claim requires: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. . ." *Welco Electronics, Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014) (internal citations and quotation marks omitted). Wells Fargo argues a bank may not be sued for conversion of funds because the bank assumes title of deposited funds. But conversion can be based on a right to possession, in addition to ownership. *See Wells Fargo Bank, N.A. v. Jackson Jenkins Renstrom LLP*, 2015 WL 1138419, *11 (Ct. App. Cal. Mar. 12, 2015) (holding that a right of possession, separate and distinct from a right of ownership, may form the basis of a conversion claim). In the sizeable MDL, *In re Checking Account Overdraft Litig.*, the Southern District of Florida addressed this exact issue in the context of overdraft fees:

> Here, Plaintiffs unquestionably had the right to possess the funds in their bank accounts upon demand to the bank, and they have alleged the Defendants wrongfully took funds from their accounts so that Plaintiffs were unable to possess and use those funds. This interference with Plaintiffs' property interest in the funds in their accounts constitute a cause of action for conversion. Moreover, as the above cases demonstrate, a conversion action is available for a bank's wrongful debiting of funds from a customer's account.

1   694 F. Supp. 2d 1302, 1323 (S.D. Fla. 2010).

2        Citing *In re Checking Account Overdraft Litig.* with approval, Judge Bashant

3   recently upheld a claim for conversion against Navy Federal Credit Union, noting that

4   "[t]he majority of federal courts that have addressed this question . . . find that plaintiffs

5   may bring a conversion claim [against a bank] for fees that are alleged to have been

6   wrongfully assessed." *Lloyd*, 2018 WL 1757609, at *12; *see also In re TD Bank, N.A.*,

7   150 F. Supp. 3d 593, 630 (D.S.C. 2015) (denying dismissal of conversion claim in light

8   of court's denial of breach of contract claim dismissal); *White v. Wachovia Bank, N.A.*,

9   563 F.Supp.2d 1358, 1371 (N.D. Ga. 2008) (same).

10  Date: February 20, 2020           Respectfully submitted,

11                                        */s/ Todd D. Carpenter*

12                                        Todd D. Carpenter (CA 234464)
                                      tcarpenter@carlsonlynch.com

13                                        **CARLSON LYNCH, LLP**
                                      1350 Columbia St. Ste. 603

14                                        San Diego, California 92101
                                      Tel:   (619) 762-1900

15                                        Jeffrey D. Kaliel (CA 238293)

16                                        jkaliel@kalielpllc.com
                                      Sophia Gold (CA 307971)

17                                        sgold@kalielpllc.com
                                      **KALIEL PLLC**

18                                        1875 Connecticut Ave., NW, 10th Floor
                                      Washington, D.C. 20009

19                                        Tel:   (202) 350-4783
                                      *Attorneys for Plaintiffs and the Class*

20

21

22

23

24

25

26

27

28